**Jeanne D. JACKSON, Plaintiff,**

v.

**Sidney S. COGGAN, Defendant.**

**No. 67 Civ. 1864.**

United States District Court,
S. D. New York.

July 13, 1971.

Gregoire & Sargent, by Armand Gregoire, New York City (Kanner & Halberstan, by Irving Kanner, New York City, Trial Counsel), for plaintiff.

Berman & Frost, New York City, for defendant Sidney S. Coggan; Marvin V. Ausubel, New York City, of counsel.

## OPINION, FINDINGS OF FACT and CONCLUSIONS OF LAW.

LEVET, District Judge.

This is an action for personal injuries allegedly sustained by the above-named plaintiff, Jeanne D. Jackson ("Jackson") against the above-named defendant, Sidney S. Coggan ("Coggan"). Jurisdiction is based on diversity. Trial was before the court.

Plaintiff, born January 4, 1931 and who resided in New York, although not a citizen of the United States, was visiting relatives in France, and defendant asked her to go for a ride in a rented car which he drove. In the course of this ride an accident occurred, as a result of which plaintiff claims injuries. Both parties agree that French law applies and have submitted proof by affidavits and opinions of what that law is.

After hearing the testimony of the parties and examining the pleadings, the exhibits, affidavits in respect to French law and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, I make the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Plaintiff is a citizen of France; defendant is a citizen of the United States and a resident of the State of New Jersey. On July 24, 1966, plaintiff was a guest in an automobile rented to and operated by defendant. Plaintiff and defendant were touring, "to see the scenery" (14),[1] traveling along a toll road running between the towns of Cagnes and Frejus, called L'Auto Route de Esterel, in France (171).

2. On July 24, 1966, between 11:00 A.M. and 12:00 noon, defendant commenced driving a Simca automobile, in which plaintiff was a social guest passenger, at St. Jean Cap Ferrat, in France (11, 14, 15, 226, 267). He drove from there to St. Paul de Vence, during which time plaintiff was a front seat passenger in the automobile (16, 171, 267, 268). This portion of the trip took an hour or an hour and a half (171). During that part of the journey, plaintiff was awake and observed how the defendant was driving (227).

---

1. Unless otherwise identified, numbers in parentheses refer to pages in the stenographer's minutes of the trial.

3. At St. Paul de Vence defendant parked his automobile and the parties walked around for an hour or so (15, 16, 226, 268). The parties then got back into the automobile, plaintiff resuming her front seat (16). They drove to a town called Vence, where another stop was made for sightseeing and shopping (15, 16, 171, 226, 227, 234, 268). At one of these stops they ate lunch (16, 227, 233, 237, 268).

4. During the trip from Cap Ferrat to St. Paul de Vence (226), plaintiff observed how defendant was driving (227), that he was driving in an abnormal manner, that he was zigzagging outside the lane (228). The road was mountainous with turns (229). Plaintiff said: "He [referring to defendant] has never driven very well." Plaintiff was also aware that after lunch defendant looked to be "tired." (228)

5. In spite of the foregoing knowledge of plaintiff, at none of the stops made did plaintiff ask to be taken back to Cap Ferrat or say anything specifically to defendant about his driving (234) Although she had a driver's license, she did not take over the driving wheel (230). I find that at no time during the course of that trip did plaintiff protest or complain to defendant about the manner in which he was driving, nor did she act to take over the driving (271).

6. Although plaintiff was aware of the manner in which defendant was operating the vehicle before he commenced the last leg of the journey, and was further aware of his apparent physical infirmities, including being "tired," she, nevertheless, returned to the automobile for the trip to Frejus (16, 236). At the outset of this portion of the trip plaintiff was in the front of the automobile, but at some time later she went into the rear of the automobile and went to sleep (16, 17, 236, 251).

7. The accident occurred on July 24, 1966 on a highway called Esterel Cote D'Azur near Frejus, France (3) between 5:00 and 5:30 P.M. (172). The roads were dry (269). Defendant was driving west at a speed of about 60 miles (90 kilometers) per hour around a slight curve to the right with a slight downgrade when his vehicle skidded on pebbles on the roadway (Ex. 18; 261, 264, 268). It skidded off into the shoulder and the two right wheels went into a concrete culvert (261, 268). The car did not collide with any object nor did it turn over (252, 268, 269). There was nothing wrong with the automobile after the accident (255). Defendant stated at the time of the accident, "Oh, my God, I fell asleep, we are getting into an accident." (18)

8. When the accident occurred plaintiff struck her right elbow and struck her forehead against the back of the front seat and fell to the floor of the rear of the car. She had a bump on her head (26, 27, 28) but did not bleed (252) or have any marks or bruises or lumps on any part of her body other than the bump (253-254). After she was assisted out of the automobile, she walked into another automobile and thereafter walked into an ambulance to take her to the Frejus Hospital (21, 22, 25, 172, 173).

9. At the Frejus Hospital plaintiff was examined by a doctor and X-rays were taken. She had a black-and-blue mark on the right occipital region and on her right elbow. She also had vomiting sensations and nausea (25-26, 254). She was in the Frejus Hospital between one and two hours (254, 255). While at this hospital they X-rayed her head but no other part of her body (253) and did not put any bandages on her nor did they give her any medicine (254). No report from the Frejus Hospital was submitted.

10. Following her sojourn at the hospital plaintiff went to her uncle's house. Shortly thereafter she went to her brother's house. Both were not far from the hospital (28, 29, 255). She remained at her brother's house for three days (256). Thereafter, defendant drove her about 100 miles from her brother's house to Cap Ferrat (256, 271). Plaintiff spent two or three days in Cap Ferrat at the home of a Mr. and Mrs.

Deerake (256, 272). During this period defendant rented a new car and went around driving to some other cities with plaintiff (272). While touring during this two or three day period, plaintiff did not have any impediment in the use of any part of her body (272). After this stay, they drove from Cap Ferrat to Nice, where they took a plane to Paris and then, in turn, a plane from Paris to the United States (272). They returned to the United States at the end of July, 1966 (35, 36, 256, 257, 272).

11. Plaintiff returned to work as a waitress at the Gaslight Club in New York City on Monday, August 1, 1966, working her regular hours from 11:00 A.M. to 5:00 P.M. (257). Plaintiff worked at the Gaslight Club from August 1, 1966 to September 13, 1966 (258). Her duties as a waitress included carrying heavy platters and trays up and down stairs. While at work, plaintiff asked for time off to go to see a doctor (40-41). On one occasion, plaintiff became ill during work and she was taken to an orthopedist, Dr. Russell O. Gee, 345 East 73 Street, New York City (43, 45).

12. A week or two after plaintiff returned to her work in New York City (in 1966) she visited Dr. Russell O. Gee, an orthopedist, at 345 East 73 Street. He examined her head, neck, back, spine and her entire body (45, 46, 47). He treated her for a few days by way of traction, massage and a heat lamp, gave her an injection and a cervical collar (48, 49). Plaintiff did not call Dr. Gee as a witness. What he found was not adduced.

13. Later plaintiff was treated by Dr. Joseph F. Giattini, an orthopedic surgeon (125). Dr. Giattini examined plaintiff first on September 20, 1966 and treated her afterwards (126). He examined plaintiff's neck, arms, upper trunk and spine and decided that she had an acute spasm of the cervical spine. He found tenderness but no evidence of nerve root compression (129). He gave her analgesics and prescribed rest. He treated her at the hospital, where she received traction, muscle relaxants and analgesics (130, 131). His diagnosis was acute cervical spasm (132, 159, 160).

14. Plaintiff was admitted to St. Vincent's Hospital, New York City, on October 15, 1966 and remained there until November 2, 1966. While at the hospital, she was under the orthopedic care of Dr. Giattini (130). While at St. Vincent's Hospital, plaintiff was treated with traction, muscle relaxants, analgesics and Darvon Compound. She was in traction from October 15, 1966 until November 1, 1966. The hospital diagnosis was "acute cervical sprain" and "anxiety reaction." No operation was performed (Ex. 11; 131–132).

15. After plaintiff's discharge from the hospital, Dr. Giattini treated her at intervals on approximately fifteen occasions (133, 134). She received physiotherapy at his office (134). Dr. Giattini said that he was of the impression that in 1966 plaintiff had "some form of nerve root compression" but on November 17, 1969 he concluded that she had *no* nerve root compression, although he found continued cervical sprain (138, 139). He could not state if plaintiff experienced pain (140). Dr. Giattini gave an *opinion* that *if pain* continued to date (i. e., date of trial) the pain and the injury will be permanent (143–145). The X-rays he took were negative for bony pathology and he found no evidence of any compression fracture (149, 155). Dr. Giattini sent plaintiff to a Dr. Henry Messer, a neurologist (156) and Dr. Messer advised him that the neurological examination on February 6, 1969 was entirely normal and, hence, there was no evidence of nerve root compression (157). (Dr. Kaplan conceded that Dr. Messer was a competent neurologist and neurosurgeon (92).) On April 20, 1967, plaintiff reported to Dr. Giattini that she was getting better and was starting to go back to work. Dr. Giattini has not seen plaintiff since November 17, 1969 (158).

16. On August 30, 1968, plaintiff came into the Roosevelt Hospital, New York City, as an outpatient in the ortho-

pedic and other clinics. It appears by the hospital record that she continued in such clinical observation at intervals to June 2, 1969, or later (Ex. 10). The first entry shows this notation: "Felt well most of summer now feels worse." "Tenderness up and down spine no loss of reflexes. No loss sensation. Imp. post traumatic back pain on September 5, 1968." The notations include: "No muscle atrophy, no muscle spasm." On September 19, 1968, the entry contains the following: "Significant emotional overlay in 37 y. o. divorcee that has lost her boy friend. Multiple symptoms but completely negative examinations. Suggest continued heat, home traction, emotional support and reassurance. Discharge On May 14, 1969 and May 21, 1969." Notations indicate "appoint. not kept." The Roosevelt Hospital record (Ex. 10) shows full range of motion of neck, back and extremities on January 4, 1970 and "Full ROM of shoulder, head and shoulder compress test is negative bilaterally." (291) There were no abnormal reflexes on February 1, 1971. There was full ROM of lumbo-sacral spine and hips (292), gait was normal even on turning (293). On June 2, 1969, the entry notes: "Neck pain is much improved. Suboccipital p. tenderness R side is less marked. Headache less frequent. Recom. cont home program. * * * [a prescription] Check 3 months." (Ex. 10)

The court notes that all treatment of plaintiff as an outpatient at the Roosevelt Hospital was subsequent to her being assaulted on July 3, 1968 (see Finding 25(d)).

17. Dr. Lawrence I. Kaplan, a specialist in neurology and psychiatry, examined plaintiff on January 29, 1970 and on April 16, 1971 (56, 57).

On the first examination Dr. Kaplan did a neuro-psychiatric examination by a series of tests (63). He explained that he found plaintiff tense, apprehensive and depressed but with no disturbance in her state of awareness or any gross mental aberration and oriented (66). Dr. Kaplan's opinion was that

plaintiff was suffering from muscular and nerve root symptoms as a result of her neck condition (69) and from "an anxiety reaction with conversion phenomena." (65).

The examination on April 16, 1971 was similar to the first examination except that plaintiff complained of more "dizziness" (72). In Dr. Kaplan's opinion plaintiff had nerve root irritation (73). The anxiety or neurosis reactions caused the dizziness, in his opinion, but he admitted that "dizziness is nothing one can see," and is solely subjective and due solely to anxiety (74–76).

At the time of the 1971 examination, Dr. Kaplan thought the anxiety and depression were worse and were contributing to plaintiff's other symptoms (78).

Dr. Kaplan concluded that the prognosis must be "a guarded one"—in substance not necessarily permanent (78, 79). He could not state that there would be no improvement (79). Plaintiff's "anxiety" is emotional and not organic (80), although he ascribed it to the accident (81).

Dr. Kaplan's diagnosis of cervical sprain was based solely on plaintiff's subjective complaints of tenderness, limitation of motion and pain (96). When Dr. Kaplan on cross-examination was confronted with various psychiatric and other problems experienced by plaintiff, he conceded that these might well be causes of plaintiff's "anxiety" (101–112; see also Finding 20). Although plaintiff complained of lack of memory in connection with her early testimony (29), Dr. Kaplan said he observed no defects in her memory (119).

18. Dr. Noel H. Kleppel, a general and traumatic surgeon, testified for defendant (283 et seq).

He examined plaintiff on February 17, 1970, particularly relative to her general state, cervical area, lumbo-sacral area, extremities, including also a neurological examination (285). Plaintiff wore no cervical collar or lumbo-sacrum support and walked with a normal gait.

Dr. Kleppel said: "Inspection of her cervical, dorsal and lumbosacral area of the spine revealed no abnormalities, no scoliosis, lordosis, which would be twisting or turning in the spinal column. I examined the lungs and the muscles of the neck and the patient['s] complaint of pain on palpation in that area. * * I examined the lumbar and paravertebral musculature and there was no complaint in that area, no muscle spasm was noted in either of the two areas. The patient complained of pain on palpation of the right shoulder muscles in the area of the deltoid or shoulder cap muscle. The trapezius and subdeltoid bursa of this area, of both areas, were normal." (286)

Dr. Kleppel testified that he "went through the range of motion for the upper extremities and this was found to be within normal limits for all planes, at the shoulders, the elbows, wrists and hands and fingers. Muscle power and upper extremities were then checked and found to be normal, biceps reflexes were found to be bilaterally normal and equal. Subsequent to that the patient was tested for trunk, lower portion of the back and spine. She performed flexion of the trunk, to the extent of being able to touch her hands to her toes without a complaint of pain. She did trunkal extension to both sides of the trunk and extension of the trunk was within normal range and without complaint." (287)

Dr. Kleppel continued: "The patient had a complaint of pain on palpation of the right greater trochanter but not on the left. That is the lateral aspect of the hip. The range of motion of the muscle power and substance of the lower extremities were then tested and they were found to be normal throughout. The patella reflexes were present and were equal bilaterally. They were normal. The public compression test was done and this was negative. The extremities were measured and no measurable atrophies were noted by comparison of the parts bilaterally at similar areas. Then the cranial nerve examination was performed and the 12 cranial nerves were examined and found to be normal for Nos. 1 through 12. There was no abnormality of motor or sensory power. The patient had normal finger to nose and knee and heel coordination tests. Station and gait were normal, the Romberg test was [normal]. * * * The patient was normal throughout the course of the examination and the remainder of the gross neurological examination, meaning her normal facial reactions with conversation and involuntary motions and so on were also within normal limits. That was the extent of the physical examination." (288–289)

Dr. Kleppel found no objective evidence of injury (289).

As to the existence of pain, Dr. Kleppel testified: "I found nothing in the physical examination which would tend to support or sustain the fact this complaint of pain was indeed pain or more than a complaint of pain." (303)

19. Plaintiff had an extensive medical and emotional history before the accident. She had tuberculosis for which she was confined to a sanitarium for five years (Ex. 10, pp. 27, 28, 31; 104). She suffered from malaria for seven years (Ex. 10, pp. 27, 31; 108). She had hypoglycemia attacks in 1959 (Ex. 10, p. 28). She had pneumonia in 1965 and suffered from colds and things of that nature (Ex. 10, p. 27; 252). She had two miscarriages (Ex. 10, p. 28; 109). She had been separated from her husband for a number of years (100, 102). "She was fairly nervous, neurotic type of person * * *." (281)

20. In addition to this pre-accident medical history, plaintiff had the following significant, unrelated post-accident medical and emotional history:

(a) While confined to the St. Vincent's Hospital from October 15, 1966 to November 2, 1966 she was examined in psychiatric consultation and it was then noted that:

"There are certainly emotional problems of neurotic nature here which could contribute to her physical complaints. She is depressed and feels

unable to resolve her personal or family problems." (Ex. 11, p. 8)

On the basis of this psychiatric evaluation her final diagnosis at that hospital was "cervical sprain" and "anxiety reaction." However, there was no reference to the fact that this anxiety reaction was due to the accident of July 24, 1966 (122, 123).

(b) Plaintiff herein commenced an action against defendant herein and one Lucienne Sylvester in the Superior Court of New Jersey, Law Division, Bergen County by a summons dated May 8, 1970 in which she claimed that on July 3, 1968 the defendants therein:

"did maliciously, viciously, wantonly, deliberately, wickedly, feloniously, outrageously, atrociously, unlawfully, and with great force and arms, and from premeditated design", did

"assault, batter, beat, strike, cut, lacerate, maim, wound, bruise and ill-treat plaintiff in a cruel and inhuman manner, in and upon her body, willfully, and on purpose, without right, justification or provocation whatever, and thereby *rendered her unconscious.*"

(Ex. A, Count 1, ¶ 1, Count 2, ¶¶ 1, 2)

Moreover, plaintiff specified the grievous injuries she suffered from this maiming of July 3, 1968:

"As a further result of said assault, battery, beating, striking, cutting, lacerating, maiming, wounding, ill-treatment and bruising the plaintiff, she was so seriously injured and mutilated that she suffered, among other injuries, *a fracture of her* nose; deep, extensive and severe contusions and abrasions over the left retroauricular area behind her right ear; a large hematoma in the left periorbital area and in the right periorbital area; *wounds over the forehead,* in the malleolar regions, and *cervical regions, bilaterally;* over her right breast; over the *dorsal part of her back;* the anterior abdominal wall, and over both buttocks; as well, of both knees, and the posterior aspect of her left thigh, all of said injuries having caused her *great and excruciating pain, torture and agony of body and mind;* additionally, plaintiff suffered a *severe and grievous shock to her nervous system."* (Ex. A, Count 1, ¶ 2)

Finally, plaintiff admitted to the permanency of these horrendous injuries which necessitated hospitalization and permanently impaired her earning capacity:

"As a further consequence, she *was hospitalized,* and thereafter confined to her bed, at home, for a long period of time and was prevented from attending to her necessary business and affairs, and was compelled to *undergo great expense in procuring hospital and medical services and supplies* in endeavoring to effect a cure for the injuries, and was *permanently impaired in her future earning capacity, by reason of the permanency of said injuries,* and will hereafter be compelled to expend further sums of money in endeavoring to effect a cure for relief of her said injuries." (Ex. A, Count 1, ¶ 3) (Emphasis added)

Nowhere in these allegations did plaintiff allege that this maiming in any way aggravated or exacerbated any pre-existing injury or disability, including any alleged injury or disability she suffered from the incident of July 24, 1966 (Ex. A.)

By check dated June 24, 1970, plaintiff herein received from defendant herein $8,250 in settlement of her claims for personal injuries suffered as a result of the assault of July 3, 1968 (Ex. B).

(c) On September 19, 1968, it was noted with respect to plaintiff that she had a "significant emotional overlay" due to the fact that she "lost her boyfriend" (Ex. 10, p. 12).

(d) On October 20, 1969, it was noted that her "nose [was] broken 1 yr. ago when being beaten by two men" (Ex. 10, p. 27).

(e) She was treated at Roosevelt Hospital for problems involving cystitis, urological problems and gynecological prob-

lems on August 8, 1969, September 25, 1969, October 7, 1969, October 20, 1969, November 17, 1969, July 10, 1970, August 7, 1970 and September 11, 1970 (Ex. 10, pp. 19, 20, 23, 31, 47, 48, 51).

(f) She suffered from chronic bronchitis (Ex. 10, p. 25, October 7, 1969). "In July, [1969] she started to have colds manifested by hoarse voice, shortness of breath, fever, headaches, prostration". These complaints continued to October 20, 1969. "Cough productive of green and black sputum was present too." She had chest pain, bilateral bronci atrial flutter, lost weight and her urine burned (Ex. 10, pp. 23, 28, 31). She had palpitations associated with hypoglycemia and numbness of the left arm (Ex. 10, p. 28). These chest pains continued on November 17, 1969 (Ex. 10, p. 41).

(g) Plaintiff's 18-year-old son was arrested and convicted in 1969 for using narcotics and was under the jurisdiction of the Probation Department until December 1970. In addition, in June, 1970, he was arrested for the possession and use of heroin (243, 244).

21. Plaintiff repeatedly testified to her feelings of pain, at the hospital (25–26); at her uncle's house (28, 29); at her brother's house (30, 31, 33); at the home of Mr. and Mrs. Deerake (34, 256); after her return to New York (37, 257); while at work (39); at Dr. Gee's (46, 47); at Dr. Giattini's, November 17, 1969 (139–141); at Roosevelt Hospital, August 30, 1968 (Ex. 10); at Roosevelt Hospital, September 5, 1968 (Ex. 10); at Roosevelt Hospital Clinic (Ex. 10).

As heretofore indicated:

1. Dr. Giattini diagnosed plaintiff's injuries as acute cervical sprain (132, 159, 160), but on November 17, 1969 he could not tell if she experienced pain (140). Dr. Giattini on April 20, 1967 found plaintiff was getting better and was about to go back to work (158).

2. Dr. Henry Messer, a neurologist, found plaintiff's neurological examination entirely normal and that, hence, there was no evidence of nerve root compression (156, 157).

3. From Dr. Kaplan's examinations of plaintiff on January 29, 1970 and April 16, 1971, he was of the opinion that plaintiff was suffering from "muscular symptoms and nerve root symptoms * * * as a result of her neck condition" and from "an anxiety reaction with conversion phenomena." (69) By reason of the facts enunciated in Finding of Fact 20, this court is compelled to disregard Dr. Kaplan's conclusion as to any substantial anxiety symptoms caused by the accident involved in this case.

4. Dr. Noel H. Kleppel on February 17, 1970 found no evidence of abnormalities of plaintiff, no objective evidence of injury and no evidence of pain (Finding 18).

Moreover—

1. The extent and continuance of plaintiff's pain is somewhat uncertain. Her testimony was not convincing since she uniformly recited that she had pains in her arm, shoulder, back and head in a sort of monotonous refrain.

2. There was little evidence of any objective causes of pain and little, if any, testimony that future pain will occur. Dr. Giattini merely stated that *if* the proof indicated that pain in the cervical spine continued to the date of trial, the injury and the pain would be permanent (145, 146). Dr. Kaplan's so-called "prognosis" was uncertain (see Finding of Fact 17; 78–81).

3. By reason of plaintiff's injuries sustained from the assault of July 3, 1968, which was subsequent to the accident of July 24, 1966 (see Finding of Fact 20), the element of proximate cause of plaintiff's injuries from the accident of July 24, 1966 must per force be considerably discounted.

4. By reason of other anxiety problems (see Finding of Fact 20), plaintiff's "anxiety" symptoms again must be questioned as to any resultant connection with the accident involved herein.

Hence, in any determination of a valuation for so-called past pain, suffering and disability, the court is compelled to consider the impact of all of these factors.

22. Plaintiff has worked intermittently since the accident at various places, including the Gaslight Club, 1966; Bill's Gay Nineties, 1968, The Steak House (200–207).

The proof with respect to the claim for past lost wages is exceedingly sparse; and for future lost wages it is barren.

In the first place, no medical testimony was adduced to the effect that plaintiff was unable to work for any extended period between the time of the accident and the time of trial or in the future; secondly, the same factors specified by the court in Finding 21 apply here with equal force; thirdly, the testimony of plaintiff as to inability to work is not convincing; fourthly, the testimony of Dr. Giattini indicated that on April 20, 1967, plaintiff was capable of work (see Finding 15).

The proof of prior earnings of plaintiff was as follows:

1963 – wages and tips
(Ex. 21) ..............$ 2,870
1964 – wages and tips
(Ex. 22) ..............$ 2,279
1965 – wages and tips
(Ex. 23) ..............$ 1,956

Thus, in the years 1963, 1964 and 1965, plaintiff's average annual income was approximately $2,368. In 1966, the year of the accident, plaintiff earned $2,764, of which six weeks' wages were after the accident date.

Income after the accident seems to have been as follows:

1967 – total
(Ex. 25; 217, 219) .....$ 2,376
(But $2,080 was received from plaintiff's husband for the support of her son)
1969 (Ex. 27) .......... 910
1970 (Ex. 28) .......... 400

23. Plaintiff is entitled to an award of $1,805.25 for (reasonable) hospital and doctors' bills as follows:[2]

Frejus Hospital
(Ex. 19; 190) ........$ 5.00
St. Vincent's Hospital
(Ex. 20; 192) ........ 1,155.25
Dr. Joseph F. Giattini
(Ex. 14) .............. 645.00

Total ................$ 1,805.25

24. I find that plaintiff is entitled to the sum of $4,000 for past pain, suffering and disability (i. e., from July 26, 1966 to date).

25. I find that plaintiff is entitled to compensation for lost wages from September 13, 1966 to May 1, 1967. Based upon a pre-accident average of approximately $2,375 annually, or approximately $46 per week for the three years prior to 1966, I award the sum of $1,518 for past lost wages.

26. Plaintiff has failed to prove that she is entitled to any award for either future lost wages or future pain, suffering and disability.

27. I find that the law of France governs the disposition of the plaintiff's claim in this action. I further find that the French law of negligence as to automobile accidents which involve a social guest is as follows:

1. The social guest may invoke Article 1384, paragraph 1 of the Civil Code, which reads: "A person is responsible not only for the injury which he causes by his own act, but also for that which is caused by the act of persons for whom he is responsible, or things which he has in his care." The French courts have interpreted this article, particularly the last phrase, to include automobiles in which the plaintiff was a guest of the defendant (Le Continent Insurance Co. v. Landru v. Schroeter, Cour de Cassation [ch. mixte], Dec. 20, 1968 [1969] Dalloz Jurisprudence 43).

2. All sums found to be due plaintiff for damages in Findings 23, 24 and 25 are subject to ⅔rds deduction as hereinafter stated.

■ 2. The effect of Article 1384(1) is to raise a presumption of liability against the defendant without any proof of negligence required of the plaintiff. This presumption, however, rebuttable by, among other things, a showing that the damage was a result of a fault of the victim (faute de la victime).

■ 3. The defense of the fault of the victim may exonerate the defendant either totally or in part, even absent a showing that the fault of the victim was the sole cause of the accident. In other words, even if part of the fault lies with the defendant, the plaintiff may, nevertheless, be barred from recovery if the fault is serious enough.

28. The court consequently finds that the actions of plaintiff constituted "faute de la victime" and bar her from recovering two-thirds of her damages as heretofore found.

29. Hence, I find that plaintiff would be entitled to the following damages before deduction as heretofore determined:

| | |
|---|---|
| Hospital and doctors' bills (Finding 23) | $ 1,805.25 |
| Past pain, suffering and disability (Finding 24) | 4,000.00 |
| Past lost wages (Finding 25) | 1,518.00 |
| Total before deduction | $ 7,323.25 |
| After deducting ⅔rds | $ 2,441.08 |

## DISCUSSION

Both plaintiff and defendant agree that the substantive law of France, the place of the accident applies in this case. Each attorney has submitted in affidavit form his respective contentions as to the effect of French law.

### FRENCH LAW AS TO LIABILITY

The French law of tort liability is based upon three articles of the Civil Code, 1382, 1383 and 1384. Article 1382 lays down the broad principle that a person is responsible for the damage caused by his fault. Article 1383 extends that principle to include damage resulting from negligence and carelessness in addition to intentional acts. Article 1384 (1) goes even further and imposes vicarious liability on the "guardian of the thing" (gardien de la chose) that causes the damage without any showing of fault or negligence on the part of the guardian. Although the French courts were reluctant to apply Article 1384(1) to automobiles as the "thing" causing the damage, they eventually accepted this concept in 1930 (Affaire Jand'heur, ch. reun., 13.2.1930, D.1930.1.57). However, the Cour de Cassation originally refused to allow a social guest to have the benefit of the presumption of Article 1384 on the grounds that the guest implicitly agreed to accept the risk inherent in riding in an automobile. The guest's only recourse was to show fault or negligence under Article 1382 or 1383. Veuve Gasse v. Saby, Cour de Cassation [2d ch. civ.], March 27, 1928 [1928] Dalloz I. 145. But recently, the Cour de Cassation relented and allowed a social guest to rely on Article 1384(1). Le Continent Insurance and Landru v. Schroeter, Cour de Cassation [ch. mixte], Dec. 20, 1968 [1969] Dalloz Jurisprudence 43.

■ Thus, under the most recent French decisions, there is no doubt that the plaintiff may employ Article 1384(1) in the case at bar. However, Article 1384 does not have the effect of imposing absolute liability on the defendant, as the plaintiff would have this court rule. While it is true that the plaintiff need not introduce any evidence of negligence in order to establish defendant's liability, Article 1384(1) merely gives rise to a presumption of liability, which the defendant may rebut in several ways. First, he may show that the act causing the damage was unavoidable, thus totally exonerating himself. Second, he may prove that the damage was the result of either (1) the act of the victim, (2) the act of a third party, or (3) the occurrence of a fortuitous event. Any one of those circumstances may exonerate him totally or in part. See A. Tunc, French Accident Compensation, 79 Harvard Law Review 1409, 1412 (1966). The particular defense raised by the defendant in the instant case is that the

damage was the result of the fault of the victim (faulte de la victime).

The plaintiff is technically correct when he states that the doctrine of contributory negligence does not exist in French law. That doctrine is peculiar to the common law. However, the doctrine of "faute de la victime" operates in much the same way that contributory negligence does to make the victim affirmatively responsible for his own safety. "The *policy* of the courts is that everyone *must protect himself from bodily harm* * * *." B. Strack, La Pluralite Des Causes De Dommage et La Responsabilite Civile, Jurisclasseur Periodique [1970] I 2339. Contrary to plaintiff's position, the fault of the victim may result in a complete bar to plaintiff's recovery.

The acquiescence of the social guest in riding in a vehicle when she perceived the driver to be incapable of operating the vehicle safely has been found to constitute "faute de la victime" which partially barred plaintiff from recovery. Tonneau, Court of Appeals of Douai, May 24, 1967 [1967] Dalloz-Sirey, Jurisprudence 700; Maurer, Tribunal de Grande Instance, Paris, Nov. 20, 1969 [1970] Dalloz-Sirey, Jurisprudence 196. In at least one instance, the fault of the victim (which consisted of riding in a car as a social guest where the victim knew the driver to be intoxicated) totally barred the plaintiff from recovery. Terry and General Insurance Company v. Volpetti and Hoxter, Court of Appeals of Paris, Dec. 7, 1961 [1962] Dalloz-Sirey, Jurisprudence 302. Although none of the above cases involved Article 1384, the cases and French authorities indicate that the same reasoning should apply where the plaintiff relies on Article 1384(1) for relief.

Two cases cited by defendant illustrate that proposition: Cecchy v. New Stores Company, Cour de Cassation, May 1, 1965 [1966] Dalloz-Sirey, Jurisprudence 735; Jouffre v. Bouescq, Court de Cassation, June 16, 1965 [1965] Dalloz-Sirey, Jurisprudence 662. In both cases, the fault of the victim was held to reduce or totally bar the plaintiff's recovery even though liability was based solely on Article 1384(1). In addition, the language of the Schroeter case, which plaintiff relies upon for her claim of absolute liability, supports the court's position: "[T]he liability resulting from Art. 1384(1) of the Civil Code can be invoked against the person in control (gardien) of the thing by the passenger transported in the vehicle gratuitously, *except in those cases where the law provides otherwise.*" Le Continent Insurance Company and Landru v. Schroeter, supra. (Emphasis added) Finally, the court's finding is further supported by the conclusions of Professor B. Starck, of the Law School of the University of Paris, in his article on the plurality of causes of damage. B. Starck, La Pluralite des Causes de Dommage et la Responsabilite Civile, supra.

The plaintiff herself testified that she had several opportunities to leave defendant's vehicle; that she was aware of defendant's erratic operation of the vehicle; that she complained to him about his driving and asked him to let her drive; that in spite of these factors she continued to ride with defendant. In the light of these facts this court finds that plaintiff's actions constitute fault of the victim under the French law and that, therefore, her recovery may be barred either totally or in part.

In deciding the effect of the fault of the victim on her award, it is proper for the court to look to the fault of the "guardian of the thing," even though none was asserted by plaintiff under Article 1384(1). B. Starck, supra, at 58. The court finds that defendant's operation of the vehicle did indeed constitute fault.

The French cases previously cited indicate that plaintiff will be barred from total recovery only when the fault of the victim is of an extremely reprehensible nature. The court does not consider the facts in this case to warrant such a conclusion. However, in comparing the fault of the victim with that of the de-

fendant, the court does find that plaintiff's failure to take the necessary steps for her own protection was a major factor in producing her injury. Therefore, I find and conclude that plaintiff is barred from recovering two-thirds of her damages under the circumstances of this case.

## PROCEDURAL QUESTIONS

■ "In matters of evidence the law of the forum controls, with respect to presumptions, admissibility, the burden of proof, and weight and sufficiency of evidence." 31 C.J.S. Evidence § 5, pp. 821, 822; DeVito v. United Air Lines, 98 F.Supp. 88 (E.D.N.Y.1951); Glenn v. United States, 137 F.Supp. 512 (S.D.N.Y.1956); Arnold v. Wilson, 107 F.Supp. 961, 962 (S.D.Texas 1952); Lobel v. American Airlines, 192 F.2d 217 (2nd Cir. 1951); Presser Royalty Co. v. Chase Manhattan Bank, 272 F.2d 838 (2nd Cir. 1960); Hausman v. Buckley, 299 F.2d 696 (2nd Cir.), cert. denied 369 U.S. 885, 82 S.Ct. 1157, 8 L.Ed.2d 286 (1962); Dill v. Scuka, 279 F.2d 145 (3rd Cir. 1960); Moran v. Pittsburgh-Des Moines Steel Co., 166 F.2d 908, 917 (3rd Cir. 1948); Montgomery Ward Co. v. Callahan, 127 F.2d 32 (10th Cir. 1942); Wright v. Palmison, 237 App.Div. 22, 23, 260 N.Y.S. 812 (2nd Dept.1932); Clark v. Harnischfeger, 238 App.Div. 493, 264 N.Y.S. 873 (2nd Dept.1933); Anderson v. Material Coordinating Agency, Sup., 63 N.Y.S.2d 324 (1946).

■ Hence, I conclude that the burden of proof, weight and sufficiency of the evidence in respect to damages, etc. in this case are controlled by the law of the State of New York, i. e., the law of the forum.

## BURDEN OF PROOF IN NEW YORK

"The necessity of medical testimony to support a claim for *permanent* injuries in New York has been enunciated as follows:

" 'The future consequence of an injury, in a personal injury action, cannot be left to the speculation and conjecture of the trier of the facts, and it has been stated that medical testimony to support a claim for permanent injuries is necessary [footnote omitted]. Testimony of physicians may be the only means of arriving at a conclusion on the length of time an existing injury will continue [footnote omitted].

" 'In general, however, the necessity of expert testimony, to warrant submission of an issue as to permanency of an injury, depends upon whether the injury is one of an objective nature, such as the loss of an arm, leg, or other member, from which the jury may draw their conclusions as to future pain and suffering, [footnote omitted] or whether the injury is subjective and of such nature that laymen cannot with reasonable certainty know whether permanent injury will follow. [footnote omitted.]'

13 New York Jurisprudence 531–532, and cases cited, including Gallachicco v. State, [Ct.Cl.] 43 N.Y.S.2d 439 (1943); 115 A.L.R. 1149; Webb v. Union R. Co., 44 App.Div. 413, 60 N.Y.S. 1087 (1st Dept.1899); see 13 New York Jurisprudence 535 and cases cited.

"There is no precise rule for fixing the value of pain and suffering; the trier of the facts must determine the value from all of the evidence in the particular case. Paley v. Brust, 21 App.Div.2d 758, 250 N.Y.S.2d 356 (1st Dept.1964); Robison v. Lockridge, 230 App.Div. 389, 390, 244 N.Y.S. 663 (4th Dept.1930).

"However, as to future pain and suffering, ' * * * [d]amages may be recovered only for such pain and suffering as it is reasonably certain will ensue [footnote omitted]—when it is reasonably certain from the evidence that such damages will necessarily result from the original injury [footnote omitted].' 13 New York Jurisprudence 534; Curtis v. Rochester & Syracuse R. Co., 18 N.Y. 534, 542 (1859); Clarke v. Westcott, 2

App.Div. 503, 37 N.Y.S. 1111 (1st Dept.1896), aff'd 158 N.Y. 736, 53 N.E. 1124 (1899). Although '[a]b-solute certainty is not required as a basis for recovering damages for future pain and suffering,' '[t]he degree of certainty required is "reasonable certainty" * * *.' 13 New York Jurisprudence 535, citing, among other cases, Ayres v. Delaware L. & W. R. Co., 158 N.Y. 254, 53 N.E. 22 (1899).

" '* * * Recovery may be had for loss of future earnings provided they are shown with reasonable certainty and are not merely speculative in character [footnote omitted] * * *.' 13 New York Jurisprudence 538, citing Dunkel v. McDonald, supra.

"It has been held that '[l]oss of earnings is not recoverable in an action for personal injuries unless the plaintiff pleads this element of damages, [footnote omitted] and in order to recover for such loss, the plaintiff must show some basis upon which to compute the amount of his loss [footnote omitted].' 13 New York Jurisprudence 539; Neumann v. Metropolitan Tobacco Co., 20 Misc.2d 1013, 189 N.Y.S.2d 600 (1959); Nemorofskie v. Interurban Street R. Co., [Sup.] 87 N.Y.S. 463 (1904). The plaintiff 'must show with reasonable certainty [footnote omitted] that he lost the wages in consequence of the injury, and how much they were [footnote omitted].' 13 New York Jurisprudence 539, and cases cited."

Yarrow v. United States, 309 F.Supp. 922, 931–932 (S.D.N.Y.1970).

## CONCLUSIONS OF LAW

1. At the time of the accident and at the time this action was instituted, plaintiff was a citizen of France and a resident of the City and State of New York. Defendant was a citizen of the United States and a resident of the State of New Jersey. The court has subject matter jurisdiction based on diversity of citizenship and jurisdiction over the parties. The amount in controversy exceeds $10,000 exclusive of interests and costs. 28 U.S.C. §§ 1331(a), 1332(a).

2. The law of France governs this action. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963).

3. The applicable provisions of the Civil Code of France, as translated, are as follows:

"Art. 1382—Any act of man which causes damages to a third person obligates him, through whose fault it occurred, to repair it."

"Art. 1383—Every person is responsible for the damages he has caused not only by his own acts, but also through this negligence or imprudence."

"Art. 1384(1)—One is responsible not only for the damage he causes by his own acts, but also for the acts of other persons for whom he ought to respond, or by the things over which he has custody."

4. Under the French law, conduct of the "victim" which contributes to his injury (faute de la victime), may bar him from recovery either totally or partially, even if he relies solely on Article 1384(1) to establish defendant's liability. Cecchy v. New Stores Company, Cour de Cassation, May 1, 1965 [1966] Dalloz-Sirey, Jurisprudence 735; Terry and General Insurance Company v. Volpetti and Hoxter, Court of Appeals of Paris, Dec. 7, 1961 [1962] Dalloz-Sirey, Jurisprudence 302.

5. Plaintiff's conduct (failure to remove herself from defendant's vehicle while she was aware of his erratic operation of such vehicle) constitutes "faute de la victime" under the French law. Tonneau, Court of Appeals of Douai, May 24, 1967 [1967] Dalloz-Sirey, Jurisprudence 700; Maurer, Tribunal de Grand Instance, Paris, Nov. 20, 1969 [1970] Dalloz-Sirey, Jurisprudence 196; Terry and General Insurance Company v. Volpetti and Hoxter, Court of Appeals of Paris, Dec. 7, 1961 [1962]. Dalloz-Sirey,

Jurisprudence 302. Therefore, plaintiff is barred from recovering two-thirds of her damages otherwise recoverable.

6. Under Article 1384(1) of the French Civil Code, defendant is liable for the injuries which plaintiff sustained as a result of the accident.

7. I conclude that plaintiff is entitled to the following damages prior to any reduction:

| | |
|---|---|
| Hospital and doctors' bills .................. | $ 1,805.25 |
| Past pain, suffering and disability .............. | 4,000.00 |
| Past lost wages .......... | 1,518.00 |
| Total gross damages .... | $ 7,323.25 |

8. I conclude that plaintiff is not entitled to any compensation for either future lost wages or future pain, suffering and disability or any other loss.

9. Since plaintiff is barred from two-thirds of her recovery (see Finding of Fact 28), her net damages are $2,441.08.

10. Plaintiff is entitled to judgment in the sum of $2,441.08.

11. Pursuant to Title 28 U.S.C. § 1332(b), plaintiff is allowed no costs.

Settle judgment promptly upon notice and pursuant hereto.